In re BASS MECHANICAL CONTRAC-
TORS, INC., Debtor.

HECKATHORN CONSTRUCTION COM-
PANY, INC., York–Shipley, A Division
of Donlee Technologies, Inc., Tyson
Foods, Inc., and Tyson Food Employee
Pension Trust, Plaintiffs,

v.

BASS MECHANICAL CONTRACTORS,
INC., and Jill Jacoway, Trustee,
Defendants.

Haskell JOHNSON, Howard Baird &
Courtney C. Crouch, Trustees (or their
Successors) of Tyson's Food Employee
Pension Trust; and Tyson Foods, Inc.,
Plaintiffs,

v.

BASS MECHANICAL CONTRACTORS,
INC. and Jill Jacoway, Trustee,
Defendants.

YORK–SHIPLEY, A DIVISION OF
DONLEE TECHNOLOGIES,
INC., Plaintiff,

v.

BASS MECHANICAL CONTRACTORS,
INC., Defendant.

Bankruptcy Nos. FA 87–73F, CMS 87–
735, CMS 87–736 and CMS 87–979.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

March 23, 1988.

Marcia M. Brinton, Fayetteville, Ark., for Jill R. Jacoway, Trustee.

Stephen E. Adams, Fayetteville, Ark., for Heckathorn Const. Co., Inc.

Larry J. Thompson, Springdale, Ark., for First Nat. Bank of Springdale.

Steve Crane, North Little Rock, Ark., for York–Shipley, a Div. of Donlee Technologies, Inc.

Charles Stutte, Fayetteville, Ark., for Tyson Foods, Inc. and Tyson Food Employee Pension Trust.

Kit Williams, Fayetteville, Ark., for Bass Mechanical Contractors, Inc.

Marshall Dale Evans, Fayetteville, Ark., for Delbert and Mary Bass.

## MEMORANDUM OPINION

ROBERT F. FUSSELL, Chief Judge.

### A. *Procedural Background*

On January 20 and 21, 1988, this Court conducted an evidentiary hearing on the above contested matters and the chapter 7 trustee's Motion for Proposed Distribution of Assets from the estate of the debtor, Bass Mechanical Contractors, Inc. (Bass Mechanical). The contested matters and motion were consolidated for trial by agreement of all parties.[1]

The chapter 7 trustee's motion for proposed distribution seeks to distribute $58,498.99 to the First National Bank of Springdale (First National) as the secured creditor entitled to the monies, which constitute a primary asset of the debtor's estate. First National and Delbert and Mary Bass have joined in the trustee's motion. First National also has contended that it is entitled to exercise its contractual right of set-off against the debtor's general checking account. Objections to the trustee's proposed distribution along with motions for relief from the automatic stay have been filed by Heckathorn Construction Co., (Heckathorn); Haskell Johnson, Howard Baird and Courtney C. Crouch, Trustees (or their Successors) of Tyson's Food Employee Pension Trust (Haskell Johnson) and Tyson's Foods, Inc. (Tyson) and York–Shipley, a Division of Donlee Technologies, Inc. (York–Shipley). These parties contend that First National does not possess a perfected security interest in the monies to be distributed to First National or a right to set-off.

Specifically, CMS No. 87–735 was filed by Heckathorn naming Bass Mechanical and Jill Jacoway, trustee, as defendants. Motions to intervene were filed by Haskell Johnson, York–Shipley and Delbert and Mary Bass and were granted by the Court. The parties in CMS 87–735 are seeking to have this Court impose a "constructive trust" on the funds to be distributed by the trustee to First National, or in the alternative, to have the Court marshal the assets of Delbert and Mary Bass before any distributions to First National are made. The parties also have contended that First National Bank does not have a perfected security interest in the monies to be distributed. In response, First National has contended that it not only has a perfected security interest in the monies, but it also has a legal right to "set-off" against the monies. CMS No. 87–376, filed by Haskell Johnson and Tyson Foods, Inc., and CMS No. 87–979, filed by York–Shipley, have raised the same issues as in CMS No. 87–375, with the parties taking the same positions thereon.[2]

### B. *Jurisdiction*

The pending contested matters and chapter 7 trustee's motion are core proceedings pursuant to 28 U.S.C. § 157(b).

### C. *Issues*

(1) Whether Heckathorn, York–Shipley, Haskell Johnson and Tyson Foods, Inc. are entitled to imposition of a constructive trust upon the balance of the funds in Bass Mechanical's general checking account which the trustee seeks to distribute to First National;

(2) Whether First National's security interest in Bass Mechanical's general checking account is perfected; and

---

1. In the three contested matters, the Court granted the defendants' motions for direct verdicts based on insufficient evidence regarding a request for "marshalling of assets." The Court's findings were orally dictated into the record at the trial and the evidence pertaining to the ruling on the marshalling of assets theory will not be repeated in this opinion.

2. York–Shipley's CMS No. 87–979 differs from CMS No. 87–375 in that York–Shipley is seeking the imposition of a "constructive trust" in the amount of $16,878 in its favor for the purchase of equipment by Bass Mechanical. Bass Mechanical had received from Heckathorn a payment which included the equipment in its December 1987 draw.

(3) Whether First National has a right of set-off against the funds remaining in the Bass Mechanical's general checking account.

### D. *Findings of Fact*

During 1972, Bass Plumbing, Heating and Cooling, Inc. filed articles of incorporation under the laws of the state of Arkansas. Delbert Bass and Mary Bass were the sole shareholders of the corporation. On January 29, 1986, Bass Plumbing, Heating and Cooling, Inc. changed its corporate name to Bass Mechanical Contractors, Inc. The name changes were filed with the Arkansas Secretary of State on February 3, 1986, and with the Washington County, Arkansas Circuit Clerk on February 6, 1986.

On January 9, 1986, Delbert Bass, as President, and Mary Bass, as Secretary, of Bass Plumbing, Heating and Cooling, Inc., executed a promissory note in the original amount of $75,000 payable to First National Bank. (Stipulated Exhibit No. 1) The note paid off a note executed a few years earlier and provided additional business financing. The promissory note provided:

> SET–OFF: You have the right to set-off any amount I owe you under this note against any right I have to receive money from you. If my right to receive money from you is owned by someone else not paying this note, your set-off can only reach funds I could have reached with my own request or endorsement. Your right of set-off does not extend to accounts where by rights are only as a fiduciary. It also does not extend to my IRA or other tax-deferred retirement account.
>
> Your right of set-off applies without your first telling me you are going to use it. It applies no matter what sort of value of collateral is on this loan. It also applies no matter who else has agreed to pay this note.
>
> You will not be liable for wrongful dishonor or a check where such dishonor occurs because you set-off this debt against my account.

Along with the note, on January 9, 1986, Bass Plumbing, Heating and Cooling, Inc. executed a security agreement granting First National a security interest in "[a]ll inventory held by the debtor for sale, lease or furnishing with services, and all additions and accessions thereto, and all proceeds of its sale or other disposition, ... accounts receivable, earned estimates and contract rights now due and that may hereafter become due to the debtor." (Stipulated Exhibit No. 8).

As part of First National's loans to Bass Plumbing, Heating and Cooling, Inc., a financing statement dated February 8, 1984 had been filed in the name of "Bass Plumbing, Heating and Cooling, Inc." with the Washington County Circuit Clerk on February 10, 1984 and with the Arkansas Secretary of State on February 13, 1984. The financing statement reflected First National's security interest in "accounts receivables, earned estimates, contract rights due or that may hereinafter become due, ... inventory of Bass Plumbing, Heating & Cooling, Inc., held by the debtor for sale, lease or furnishing with services, and all replacement [sic] thereof and additions or accessions thereto, and all proceeds of its sale or other dispositions ..." (Stipulated Exhibit No. 9A).

After the name change of Bass Mechanical was brought to First National's attention, a financing statement dated February 20, 1987 in the name of "Bass Mechanical Contractors, Inc." was filed on February 24, 1987 with the Washington County Circuit Clerk and with the Arkansas Secretary of State on February 25, 1987. (Stipulated Exhibit No. 9D). The financing statement reflected a security interest in:

> "[a]ll inventory held by the debtor for sale, lease or furnishing with services and all additions and accessions thereto, and all proceeds of the sale or other disposition ... [a]ccounts receivable, earned estimates and contract rights now due and that may hereafter become due to the debtor."

(Stipulated Exhibit No. 9D).

The financing statement also reflected the following information.

Due to Bass Plumbing, Heating & Cooling, Inc. changing its corporate name to Bass Mechanical Contractors, Inc., this document is filed to show a continuing lien on all items as listed in the following UCC–1's filed in:

Washington County, AR — #52989
#11866 (continued by #38550 & #62982)
#18072 (continued by #42816 & unnumbered
filing dated 12/18/86)

Secretary of State, AR — #0426573
#358220 (continued on 12/31/86)
#0191185 (continued until 1/27/91)

(Stipulated Exhibit No. 9D).

On August 11, 1986, Delbert Bass executed a loan guaranty agreement in favor of First National guaranteeing the January 9, 1986 Bass Mechanical note and any renewals. On August 12, 1986, Mary Bass also executed a loan guaranty agreement in favor of First National guaranteeing the January 9, 1986 Bass Mechanical note and any renewals.

In Spring 1986, Tyson and Heckathorn entered into a general contract for the construction of an addition to the Tyson corporate headquarters located in Springdale, Arkansas. Heckathorn, as general contractor for the project, by its president, Donal Heckathorn, entered into a sub-contract agreement on March 28, 1986 with Bass Mechanical, by its president, Delbert Bass, to furnish plumbing, heating, air conditioning and labor for the Tyson Foods project for a price of $525,483. Pursuant to the contract, Bass Mechanical was required to present Heckathorn with a draw request reflecting the materials costs and work successfully completed on the job on the first day of each month. Heckathorn was to pay ninety percent of the draw request upon receipt of payment for Heckathorn's draw request from Tyson. A ten percent retainage by Heckathorn was to be paid to Bass Mechanical within ten days after Heckathorn received final payment on the project from Tyson. The agreement also provided that when requested by Heckathorn, Bass Mechanical would supply proof that all laborers and materialmen had been paid.[3]

On December 30, 1986, Bass Mechanical submitted to Heckathorn a December draw request for the period of November 30, 1986 to December 30, 1986 for $68,112.00. On December 31, 1986, Heckathorn submitted an application to Tyson for payment which included Bass Mechanical's December 1986 draw request. On January 14, 1987, Tyson paid Heckathorn the amount of its December 1986 draw request. However, Heckathorn did not pay Bass Mechanical on its draw request.

In early January 1987, David Hanson, project manager for Heckathorn, received a phone call from John Taylor, a representative of Star Mechanical Contractors, Inc. (Star Mechanical), a supplier. Taylor informed Hanson that Bass Mechanical was behind over $40,000 in payments to Star Mechanical, primarily from amounts owed on the Tyson project. Hanson relayed this information to Donal Heckathorn. Hanson and Donal Heckathorn, concerned about the financial condition of Bass Mechanical, discussed the situation and decided to contact other suppliers to determine if Bass Mechanical was paying other accounts on the Tyson project.

After Hanson telephoned various suppliers of Bass Mechanical, he prepared handwritten re-caps of the amounts past due and currently due according to the information received from suppliers.[4] The first re-cap prepared by Hanson reflected that

---

**3.** On December 10, 1986, Delbert and Mary Bass individually executed a promissory note in the principal amount of $37,508.14 in favor of First National a security agreement and financing statement were also executed, but are not relevant for resolution of the constructive trust issues.

Also sometime during 1986, Tyson executed a separate contract with Bass Mechanical to perform additional work on the project. As part of its performance under this contract Bass Mechanical ordered a furnace costing $16,878.00 from York–Shipley. The furnace was shipped on November 26, 1986 and subsequently installed on the Tyson project. On January 30, 1987, Tyson Foods, Inc. paid Bass Mechanical $26,807 for costs of materials, labor and work provided by Bass Mechanical on the separate contract Bass Mechanical had directly with Tyson Foods to provide additional work on the Tyson project.

**4.** The re-caps were received into evidence as Stipulated Exhibits Nos. 16 and 17.

of the thirty suppliers contacted, sixteen of the accounts were past due, for a total past due amount of $57,330.21. Of that amount, $30,107.24 was owed to Star Mechanical. A second re-cap dated January 23, 1987, was prepared by Hanson and reflected that of twenty suppliers, six were past due for a total past due amount of $32,902.48, with $30,107.24 being owed to Star Mechanical Contractors.[5] Copies of the re-caps were given to Delbert Bass by Hanson.

Donal Heckathorn testified that after suppliers were contacted, he did not believe that Bass Mechanical could finish the Tyson project. Further, Donal Heckathorn asked Hanson to contact their attorney, Tilden P. "Chip" Wright, to ascertain Heckathorn's legal rights. On January 23, 1987, Hanson contacted Wright and informed Wright that Heckathorn previously had received a draw request of $68,112 from Bass Mechanical for which Tyson had paid Heckathorn, but that Heckathorn had not paid due Bass Mechanical. Hanson advised Wright that he had prepared a cost work-up for Bass Mechanical's job and based on the cost work-up, Hanson had determined that under Bass Mechanical's sub-contract, there would be a shortage of approximately $30,000 to $40,000 when the Bass Mechanical's job costs were to be paid. According to Wright, an amendment to the sub-contract between Heckathorn and Bass Mechanical was proposed. The amendment was proposed for two purposes—to protect Heckathorn from liens at the conclusion of the job and to provide Bass Mechanical with funds to finish the job. Heckathorn proposed a loan to cover the estimated $30,000 to $40,000 shortage conditioned on a joint checking account privilege for Bass Mechanical and Heckathorn where payments for Bass Mechanical's draw requests would be made by checks jointly payable to Bass Mechanical

and the various suppliers. With this procedure, Heckathorn could ensure the suppliers were being paid. Wright noted that the contractual amendment also would require a personal guaranty from Delbert Bass to Donal Heckathorn for any monies advanced by Heckathorn to Bass Mechanical.

Wright prepared a document entitled Amendment to Sub-Contract Agreement No. 1 (First Draft). The First Draft incorporated the purposes outlined by Wright. However, the First Draft did not provide for salaries for officers of Bass Mechanical and omitted provisions for "labor overhead." The First Draft was provided to Delbert Bass for his review.[6]

On January 24, 1987, Delbert Bass contacted his attorney, Kit Williams. Bass asked Williams to review the sub-contract and First Draft to determine Bass Mechanical's legal rights under the sub-contract and whether Bass Mechanical should agree to the First Draft. Delbert Bass informed Williams that under the First Draft, his salary would not be paid and that he objected to being held personally liable under the terms of the First Draft. Williams advised Bass that it was not in his best interest to sign the First Draft. Further, after Williams reviewed Bass Mechanical's accounts receivables and accounts payable and discussed the job with Delbert Bass, Williams believed that Bass Mechanical could complete the job successfully even though it would be a tight financial squeeze.

On February 9, 1987, Williams wrote Donal Heckathorn, president of Heckathorn, the following letter.

Dear Mr. Heckathorn:

I represent Bass Mechanical Contractors, Inc. Mr. Delbert Bass, President of Bass Mechanical Contractors, Inc., brought me Subcontract Agreement

---

5. On January 12, 1987, Bass Mechanical and Star Mechanical reached an agreement whereby Star Mechanical agreed to extend credit on an amount overdue at 10% interest until Bass Mechanical received final payment on the Tyson corporate office project. Bass Mechanical also paid Star Mechanical $11,181.90.

6. Delbert Bass, according to a testimony of Donal Heckathorn, objected to the first draft of the amended agreement because it did not contain a provision for payment of labor overhead. Donal Heckathorn had agreed that a second draft could be proposed which included labor overhead.

Number 1 executed by you and him on March 28, 1986. He also showed me your proposed Amendment to this Subcontract Agreement [First Draft].

Mr. Bass has informed me that your company has failed to pay to Bass Mechanical Contractors, Inc. for successfully completed work despite their proper presentment of an appropriate statement on the first day of the month which showed the cost of materials on the job site and the work that has been successfully completed to that date. Obviously, your withholding of the payment properly due under your contract to Bass Mechanical Contractors, Inc. has placed unwarranted and severe financial strain upon Bass and probably constitutes such a substantial breach of your contract to make your company liable for all foreseeable and consequential damages that Bass Mechanical Contractors, Inc. might suffer.

Although you have indicated your concern about the financial health of Bass Mechanical Contractors, Inc. and have, therefore, requested Mr. Delbert Bass to execute the Amendment, Bass Mechanical Contractors, Inc. stands ready to fulfill its contract with you *IF* you fulfill your obligations to it, namely pay to Bass the money it is lawfully due under the original contract. I find nothing in your contract that permits you to withhold payments to Bass Mechanical Contractors, Inc. even if you believe that the Corporation is in financial difficulty. Certainly it is improper to force concessions from the corporation because of financial difficulty caused in part by your company refusing to pay money lawfully due under the contract.

Mr. Delbert Bass, President of Bass Mechanical Contractors, Inc. does not want to start a controversy or litigation. He simply wants Heckathorn Construction Company to pay according to the agreed terms of the contract so that Bass Mechanical Contractors, Inc. can in turn pay their suppliers and workers.

Thank you for your time.

Sincerely,
/s/ Kit Williams
Kit Williams
Attorney for Bass Mechanical Contractors, Inc.
APPROVED: /s/ Delbert Bass
Delbert Bass, President
Bass Mechanical Contractors, Inc.

(Stipulated Exhibit No. 20).

Hanson, Heckathorn's employee, took the letter to Wright. On February 13, 1987, Wright contacted Williams regarding the February 9, 1987 letter. In the first of many conversations on February 13, 1987, Williams advised Wright that Delbert and Mary Bass objected to the First Draft's provisions for personal indemnification because Delbert and Mary Bass did not want to be held personally responsible for the corporate debt. Wright told Williams that the indemnification provisions could probably be resolved. A discussion was held between the attorneys regarding the $68,112 draw, with the decision being reached that $20,000 would be deposited in Bass Mechanical's corporate account and $48,000 would be paid to suppliers of Bass Mechanical's choice. Wright and Williams relayed this tentative agreement to their clients for approval. Williams testified that when he presented the proposal to Delbert Bass, Delbert Bass found it unacceptable because he felt the proposal to pay only certain suppliers would put him in a bad light with his suppliers, with whom he had maintained long term relationships. Williams contacted Wright and informed Wright that the proposal would not be agreeable if joint checks had to be written. At trial, the evidentiary deposition of Wright disclosed that Delbert Bass had negotiated agreements with Bass Mechanical's suppliers where the suppliers would be paid less than the full amount due on their bills and, although not agreeing to give lien waivers, the suppliers would not push for the balance immediately. Williams further told Wright that Delbert Bass did not want Heckathorn negotiating with Bass Mechanical's suppliers, that Delbert Bass wanted to negotiate on behalf of Bass Mechanical himself.

Wright noted that the last proposal to amend the sub-contract proposed that Bass Mechanical withhold $34,000, not $20,000, for additional costs on the Tyson project. However, when Wright conveyed the proposal to Donal Heckathorn, Donal Heckathorn would not agree and Wright informed Williams that no agreement had been reached. Williams then called Wright back around 3:31 p.m., on February 18, 1987, with an ultimatum that the $68,112 be paid by Wednesday, February 18, 1987, at 4:30 p.m., or Bass Mechanical would walk off the job. Williams additionally demanded $17,257.50 from a later draw request. Wright stated in his evidentiary deposition that Heckathorn probably had sufficient grounds to terminate the sub-contract with Bass Mechanical, even though it might not be in Heckathorn's best interest to do so since changing subcontractors during a project increased a general contractor's expenses. Wright further testified that he had reviewed the sub-contract agreement between Heckathorn and Bass Mechanical, and could determine no contractual right to withhold the $68,112 and noted that Heckathorn was exposing itself to substantial risks if it continued to withhold funds, especially if Bass Mechanical failed to survive under the financial distress caused by Heckathorn's failure to pay. After his discussion with Wright, Williams talked to Delbert and Mary Bass and explained that if Heckathorn did not pay Bass Mechanical, bankruptcy filing would have to be considered.

On February 16, 1987, a check was drawn on the account of Heckathorn at McIlroy Bank & Trust Co. payable to Bass Mechanical in the amount of $68,112. Also, on February 16, 1987, Donal Heckathorn, president of Heckathorn, wrote the following letter to Delbert Bass, president of Bass Mechanical:

Dear Mr. Bass:

The sub-contract, Article 9, requires that you supply us with proof of payment to all laborers and material men who have worked or supplied materials on this job. Demand is made that you provide us with this proof for all laborers and suppliers through the 30th day of December, 1986, within five (5) days following the delivery of this check for $68,112.00 and prior to receipt of any further progress payments on this job. The proof required is a properly executed lien waiver from all such laborers and suppliers in the form attached.

Sincerely,

HECKATHORN CONSTRUCTION COMPANY, INC.

/s/ Donal L. Heckathorn

President

(Stipulated Exhibit No. 21).

On February 17, 1987, Delbert and Mary Bass showed Williams the $68,112 check and the February 16, 1987 letter. Williams, after reviewing the February 16, 1987 letter which require Bass Mechanical provide lien waivers and conditioning future payments on the same informed Bass that no further payments would be made by Heckathorn under the contract without bringing a lawsuit against Heckathorn. Williams testified that obtaining lien waivers in the specified time was impossible because suppliers were located throughout the United States. Bass Mechanical began having severe financial problems. Bass Mechanical had no future jobs and no cash flow. Williams, in consulting with Delbert and Mary Bass, decided to file bankruptcy for Bass Mechanical under chapter 7 of the Bankruptcy Code on February 17, 1987.

Williams began preparing schedules on that day. He instructed Delbert Bass to pay employee wages, but to leave the decision of payment of the balance of proceeds of Bass Mechanical's general account to the trustee in order to avoid preferential payments being made. Also on February 17, 1987, Williams, in preparing bankruptcy schedules, made title and lien searches to determine secured creditors. When checking the records of the Washington County Circuit Clerk, Williams found the December 1986 loan with financing statements under the name of "Bass Plumbing, Heating and Cooling, Inc." and Delbert and Mary Bass. Williams wondered why the financing statements were not filed under the name of Bass Mechanical. Williams then called Jim Couch, an attorney for

First National, and inquired why the financing statements had not been filed under the name of Bass Mechanical. Couch could not give an explanation.

On February 18, 1987, the $68,112 check was deposited into Bass Mechanical's general checking account at First National. Williams was paid $1,200 from the deposit for preparation of the bankruptcy petition and schedules.

In a letter dated February 24, 1986,[7] Delbert Bass, as President of Bass Mechanical, wrote the following letter to Donal Heckathorn, as President of Heckathorn:

> Dear Mr. Heckathorn:
>
> Because of your firm's failure to pay our December, 1986, draw in a timely fashion and your failure to pay out January draw ($17,257.50) at all when due, among other breaches of our contract, Heckathorn Construction Company has so breached Subcontract Agreement No. 1 dated March 28, 1986, with Bass Mechanical Contractors, Inc. so that Bass Mechanical Contractors, Inc. is released from further performance under that contract and entitled to recover its damages, loss of profits, etc. caused by your breach.
>
> I have on this date instructed the employees of Bass Mechanical Contractors, Inc. to cease further work on the Tyson Corporate Offices job because of your breach of our contract. We request that you immediately release the retainage on this contract to Bass Mechanical Contractors, Inc.
>
> Sincerely,
> /s/ Delbert L. Bass
> President

(Stipulated Exhibit No. 24).

Vaughn Neil, an officer of First National, testified that in February 1987, he received a call from Jim Cypert, an attorney for First National, who explained that an attorney had called inquiring about Bass Mechanical's corporate name change and the reason the name change had not been reflected on First National loan documents.

Neil said he simply missed the name change and it was his mistake. On February 20, 1987, new financing statements were prepared reflecting the name change from "Bass Plumbing, Heating and Cooling, Inc." to "Bass Mechanical Contractors, Inc." and continuing the previous filing. The new financing statements were filed with the Washington County Circuit Clerk on February 24, 1987 and the Arkansas Secretary of State on February 25, 1987.

On that same date, Bass Mechanical, by corporate resolution, authorized the filing of a bankruptcy petition under chapter 7 of the Bankruptcy Code, and on March 13, 1987, the petition was filed. Shortly thereafter, Jill Jacoway was appointed as the chapter 7 trustee.

Jacoway testified, after her appointment, in reviewing the Bass Mechanical records she noticed that there was approximately $50,000 in Bass Mechanical's general checking account. Jacoway called Williams and told him she wanted to obtain the money in the checking account. Williams contacted Delbert Bass, on March 18, 1987. Delbert Bass appeared at First National and asked Neil, pursuant to Jacoway's instructions, to withdraw the monies in the Bass Mechanical account. Neil became concerned and called William Clark, an attorney for First National.

Clark then called Jacoway and stated that the bank intended to exercise its right of set-off against the account. Jacoway informed Clark that because bankruptcy had been filed, any set-offs would violate the automatic stay and suggested that an administrative freeze be placed on the account until the Court could decide entitlement to the monies. Clark agreed and the monies were placed into a separate interest bearing checking account at First National. On March 19, 1987, Jacoway confirmed this agreement with a letter to Clark dated March 19, 1987. (Stipulated Exhibit No. 25). While administering the estate, Jacoway determined that First National had a security interest in and was entitled to the

---

**7.** The parties agreed the year date of 1986 on the letter was in error and the letter should have been dated February 24, 1987.

monies in the account. Subsequently, Jacoway sent a notice to all creditors of a proposed distribution to First National based on her investigation.

After the time the monies had been placed into a separate account, Jacoway had only two expenses which were charged the account for a total of $1,300, consisting of installments for insurance coverage for the Bass Mechanical property. Jacoway later liquidated the properties and received $15,771.45.

Throughout the last few months of Bass Mechanical's operation, Bass Mechanical had commingled deposits in its general checking account. The bank records at First National reflected the following activity in the general checking account.

| December 1986 | | |
|---|---|---|
| 11/30/86 | Previous balance | $21,571.84 |
| 12/31/86 | Ending balance | $45,683.80 |
| Deposits Made: | | |
| | 12/2 | $10,663.16 |
| | 12/19 | $ 1,135.50 |
| | 12/22 | $51,529.00 |

| January 1987 | | |
|---|---|---|
| 12/31/86 | Previous balance | $45,683.80 |
| 1/30/87 | Ending balance | $ 3,997.52 |
| Deposits Made: | | |
| | 1/12 | $2,338.74 |
| | 1/14 | $1,302.28 |
| | 1/26 | $5,847.28 |

| February 1987 | | |
|---|---|---|
| 1/30/87 | Previous balance | $ 3,997.52 |
| 2/28/87 | Ending balance | $68,218.58 |
| Deposits Made: | | |
| | 2/2 | $26,807.00 |
| | 2/18 | $68,368.65 |

| March 1987 | | |
|---|---|---|
| 2/28/87 | Previous balance | $68,218.58 |
| 3/31/87 | Ending balance | $54,546.52 |
| Deposits Made: | | |
| | 3/19 | $ 12.00 |
| | 3/26 | $ 72.00 |
| | 3/27 | $ 60.00 |
| | 3/31 | $ 12.00 |
| | 3/31 | $102.36 (interest paid) |

(Stipulated Exhibits Nos. 27, 28, 29 and 30). The account activity revealed that no deposits were made and no proceeds were received within twenty-one days of filing. The most recent activity prior to the bankruptcy occurred twenty-three days before filing.

On May 6, 1987, the general checking account of Bass Mechanical had a balance of $54,544.64. On that date, First National gave a check to Jacoway for the $54,544.64 balance in the general checking account to add to the estate funds. Also on that same date, Jacoway gave First National a check for $58,499.99 from the funds of the estate based on the proposed distribution. Jacoway retained $11,816.00 for the estate.

Regarding the name change on the financing statements, Joyce Burr, an employee of the Fayetteville Credit Union, testified that at request of Delbert and Mary Bass, she performed a credit check on "Bass Mechanical Contractors, Inc." and found no derogatory information in the file maintained by Fayetteville Credit Union. She did not perform any lien searches, however, and was not retained to do so.

Williams testified that while preparing the bankruptcy petition, he conducted a lien search of Washington County Circuit Court records and located the financing statements reflecting the security interest claimed by First National in the collateral of Bass Plumbing, Heating and Cooling, Inc. which were signed by Delbert and Mary Bass. Williams noted that the filing system used by Washington County Circuit Clerk is arranged in alphabetical order and that in his opinion any reasonable person searching for financing statements on Bass Mechanical Contractors, Inc., would notice the financing statements filed for Bass Plumbing, Heating and Cooling, Inc.

On the other hand, Donal Heckathorn testified that many licensed contractors in the state have possessed similar names, and in some cases, similar addresses, and that there were no assurances that a different name could reflect the same or a successor entity. Heckathorn cited Johnson Center, Shiloh Tank Co. and Shiloh Steel Fabricators, as examples. Heckathorn testified that he had worked with Delbert Bass on a number of projects and was familiar with Bass Plumbing, Heating and Cooling, Inc. and Bass Mechanical. Heckathorn stated he always dealt with Bass on a personal basis.

### E. *Conclusions of Law*

(1) *Constructive Trust Issues.* Heckathorn, Haskell Johnson, Tyson and York–Shipley seek imposition of a constructive

trust in their favor on the $54,544.64 balance of Bass Mechanical's general checking account on May 6, 1987.[8] First National and Jacoway contend that First National is entitled to the monies as a secured creditor.

Arkansas courts have recognized and applied the common law doctrine of constructive trusts. *See Bramlett v. Selman,* 268 Ark. 457, 597 S.W.2d 80 (1980); *Henry v. Goodwin,* 266 Ark. 95, 583 S.W.2d 29 (1979); *Kingrey v. Wilson,* 227 Ark. 690, 301 S.W.2d 23 (1957); *and Horton v. Koner,* 12 Ark.App. 38, 671 S.W.2d 235 (1984). A constructive trust is an implied trust which arises when based on certain facts and circumstances it appears that the beneficial interest should not go with the legal title. *In re N.S. Garrott & Sons,* 772 F.2d 462, 467 (8th Cir.1985); *Horton v. Koner,* 12 Ark.App. at 43, 671 S.W.2d at 238; *Andres v. Andres,* 1 Ark.App. 75, 613 S.W.2d 404 (1981).

In *Horton v. Koner,* the Arkansas Court of Appeals described the application of the constructive trust doctrine.

> Constructive trusts are said to arise and be imposed in favor of persons entitled to a beneficial interest against one who secures legal title either by an intentional false oral promise to hold title for a specified purpose, and having thus obtained title, claims the property as his or her own, or one who violates a confidential or fiduciary duty or is guilty of any other unconscionable conduct which amounts to constructive fraud.

*Horton v. Koner,* 12 Ark.App. at 43, 671 S.W.2d at 238. A party seeking to impose a constructive trust must prove entitlement by clear, cogent and convincing evidence. *See Bottenfield v. Wood,* 264 Ark. 505, 509, 573 S.W.2d 307, 309 (1978) and *Robertson v. Robertson,* 229 Ark. 649, 651, 317 S.W.2d 272, 274 (1958).

■ In determining whether to impose a constructive trust in this case, the Court will consider the record evidence as presented on the issue. First, the Court will consider whether the evidence is suffi-

cient to establish that an intentional false oral promise to hold the title for a specified purpose was made. The Court concludes that the evidence is insufficient to prove such a promise. The evidence is conclusive that on February 13, 1987, the parties had reached an impasse regarding the sub-contract. Delbert Bass had refused to accept the provisions for Heckathorn issuing joint checks to Bass Mechanical and its suppliers; Delbert and Mary Bass refused consent to personal liability on loan from Donal Heckathorn. In fact, negotiations between the parties had ended with the ultimatum by Williams that money be paid or Bass Mechanical would leave the job. No promise or agreement was reached to hold or dispose of the monies due Bass Mechanical.

■ Second, the evidence does not support that a constructive trust should be imposed because of a violation of a confidential or fiduciary relationship between the parties. No substantial evidence was provided which would support a finding that a confidential relationship existed between the parties. The only evidence of this nature was Donal Heckathorn's testimony regarding previous business relationships and personal dealings with Delbert Bass. The sub-contract between Heckathorn and Bass Mechanical created no fiduciary relationship regarding the monies in Bass Mechanical's general checking account. To the contrary, the sub-contract specified that Bass Mechanical held both legal and equitable interests in its rights to payment under the sub-contract. Further, Bass Mechanical had a separate contractual obligation with its suppliers for their payments. Merely because Heckathorn paid Bass Mechanical and Bass Mechanical deposited the monies in its general checking account did not give rise to a constructive trust. A payment to a contractor or subcontractor does not create a trust or place any title to payments in suppliers who may be entitled to liens on a project. *See Cherokee Carpet Mills, Inc. v. Worthen Bank*

---

**8.** Haskell Johnson, and York–Shipley moved to adopt the pleadings of Heckathorn for the purpose of imposing a constructive trust on all funds remaining in the debtor's general checking account.

& *Trust Co.*, 262 Ark. 776, 561 S.W.2d 310 (1978); *see also Georgia Pacific Corporation v. Sigma Service Corp.*, 712 F.2d 962 (5th Cir.1983).

The Court also concludes that movants have failed to meet their burden to establish the third standard that Bass Mechanical's conduct was unconscionable as to constitute constructive fraud. Bass Mechanical may have breached its contracts with suppliers by failing to pay its suppliers and may be liable for damages under the contractual obligations, but the Court is not convinced that Bass Mechanical's conduct constituted bad faith under the circumstances or that the fact that Bass Mechanical filed bankruptcy implies bad faith.[9] The evidence as to the third standard also fails in view of Heckathorn's conduct in these proceedings. The Court is sufficiently convinced that Heckathorn's withholding of the December 1986 draw payment to which Bass Mechanical was entitled under the sub-contract significantly impacted on the continuing operations of Bass Mechanical ultimately leading to the corporation's financial failure and subsequent bankruptcy filing. Heckathorn's requirement that Bass Mechanical obtain lien waivers from all suppliers and laborers owed on the December 1986 pay request within five days after the receipt of the $68,112.00 check created a situation with which Bass Mechanical could not comply since many suppliers were located throughout the United States. Therefore, the Motion to impose a constructive trust will be denied.

(2) *Secured Status of First National.* Although First National made various loans to corporations formed by Delbert and Mary Bass, the most recent loan was made on January 9, 1986 to Bass Plumbing, Heating and Cooling, Inc. As part of the transaction, First National obtained a security interest in various corporate assets which it perfected through financing statements filed with the Arkansas Secretary of State and Washington County Circuit Clerk. On January 29, 1986, Bass Plumbing, Heating and Cooling, Inc. changed its corporate name to Bass Mechanical Contractors, Inc. However, not until February 1987 were financing statements filed reflecting the name change and First National's continuing security interest. Heckathorn, Haskell Johnson, Tyson and York–Shipley have contended that First National is not a secured creditor because the new financing statements were ineffective to perfect a security interest because the financing statements were not filed pursuant to A.C.A. § 4–9–402(7)[10] and the name change was "seriously misleading" to other creditors pursuant to A.C.A. § 4–9–402(7). Heckathorn has also argued that First National is barred from claiming a security interest in the monies in the account under A.C.A. § 4–9–306(4)(d).

The Court first will address whether Bass Mechanical's name change from "Bass Plumbing, Heating and Cooling, Inc." to "Bass Mechanical Contractors,

---

9. Heckathorn has argued that the conduct of the debtor's attorney in contacting a legal representative of First National and informing that through his lien search he could find no filing under Bass Mechanical Contractors, Inc. also constitutes grounds for the imposition of a constructive trust in these proceedings. During preparation of Bass Mechanical's schedules, Williams contacted the legal representative of First National to verify whether his check of the lien records was correct. Williams informed First National's counsel that no financing statements under the name of Bass Mechanical had been located, but several filings signed by Delbert and Mary Bass under the name of Bass Plumbing, Heating and Cooling, Inc. had been found. Although this conduct may be interpreted as an attempt by Bass Mechanical's counsel to give preferential treatment to First National and Delbert and Mary Bass, and the Basses could gain if First National's claim is found entitled to the monies in the account by a reduction of their liability under their individual guaranty, this Court is more persuaded that Williams was merely seeking to substantiate his lien search findings rather than attempting to enhance the First National's standing as a secured creditor.

10. In January 1988, the Arkansas Code Annotated, a revision of the Arkansas Statutes Annotated became effective. Therefore, references to the following Arkansas Statutes will be made to the Arkansas Code Annotated. Ark.Stat.Ann. § 85–9–402(7), *now* A.C.A. § 4–9–402(7) (1987); Ark.Stat.Ann. § 85–9–306(4)(d), *now* A.C.A. § 4–9–306(4)(d) (1987).

Inc." was "seriously misleading" under A.C.A. § 4–9–402(7). A.C.A. § 4–9–402(7) provides:

A financing statement sufficiently shows the name of the debtor if it gives the ... corporate name of the debtor. Where the *debtor so changes his name or in the case an organization its name, identity or corporate structure that a filed financial statement becomes seriously misleading,* the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time.

A.C.A. § 4–9–402(7) (1987) (emphasis supplied).[11]

▇▇▇ The determination of whether financing statements are seriously misleading is a question of fact which must be decided on a case-by-case basis. *In re Darling Lumber, Inc.,* 56 B.R. at 673; *see also In re Glasco, Inc.,* 642 F.2d at 796. When a debtor's name is incorrectly listed on a financing statement, the test is whether a reasonable search under the debtor's true name would reveal the filing, and if so, then the person searching is on notice to inquire further to discover the debtor's correct identity. *In re Darling Lumber, Inc.,* 56 B.R. at 673; *In re McGovern Auto Specialty, Inc.,* 51 B.R. at 513.

▇▇ In the present situation, Heckathorn, has failed to establish sufficient evidence that the name change was seriously misleading. The filing index system of the Washington County Circuit Clerk lists filings under the Uniform Commercial Code alphabetically. Filings of financing statements reflecting First National's security interest in the assets of Bass Plumbing, Heating and Cooling, Inc. were recorded with the Washington County Circuit Clerk.

Bass Plumbing, Heating and Cooling, Inc., incorporated since 1972, engaged in heating, air conditioning and plumbing construction and installation. The corporate address had remained the same since 1972 and Delbert and Mary Bass, as corporate officers and business purposes. The financing statement was signed by Delbert and Mary Bass.

The only evidence provided of a search of the filing index in the Washington County Circuit Clerk's office was made by Williams, Bass Mechanical's attorney. Williams testified that from his search, he located several financing statements filed under Bass Plumbing, Heating and Cooling, Inc. which were signed by Delbert and Mary Bass on his search.[12] Williams' search is illustrative of what would constitute a reasonable search in this case. A reasonable person making a lien search would have been expected to look under the alphabetic letter "B" and would have noticed the similarity of names. Therefore, the Court concludes that the name change from Bass Plumbing, Heating & Cooling, Inc. to Bass Mechanical Contractors, Inc. was not seriously misleading in order to render First National an unsecured creditor. The Court notes, however, that if the name had been changed to a less similar name such as Mechanical Contractors, Inc. or another name which might not have been located by a reasonable person making a lien search, it might have reached a contrary result.

▇▇ Heckathorn also has raised the issue that A.C.A. § 4–9–306(4)(d) bars First National's security interest in the proceeds of Bass Mechanical's account. A.C.A. § 4–9–306(4)(d) provides:

In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security

---

11. This Court located no Arkansas case law interpreting § 4–9–402(7) and construing the language "seriously misleading." Cases decided in other jurisdictions are helpful. *See In re Glasco, Inc.,* 642 F.2d 793 (8th Cir.1981); *In re West Coast Food Sales, Inc.,* 637 F.2d 707 (9th Cir. 1981); *In re Darling Lumber, Inc.,* 56 B.R. 669 (Bankr.E.D.Mich.1986); *In re McGovern Auto Specialty, Inc.,* 51 B.R. 511 (Bankr.E.D.Pa.1985).

12. Heckathorn presented evidence that Joyce Burr merely reviewed credit information in her employer's office regarding Bass Mechanical. However, Ms. Burr stated that she did not make any lien searches at the Washington County Circuit Clerk's office.

interest in proceeds has a perfected security interest only in the following proceeds:

. . . .

(d) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest in this paragraph (d) is

(i) subject to any right of set-off; and

(ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within twenty-one (21) days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).

A.C.A. § 4–9–306(4)(d) (1987).

The facts revealed that proceeds received by Bass Mechanical were commingled with other deposits in its general checking account at First National. *See* Stipulated Exhibits Nos. 27, 28, 29 and 30. Bass Mechanical filed bankruptcy on March 13, 1987. During the twenty-one day period prior to filing, no proceeds were received and no deposits were made by Bass Mechanical. In fact, the last deposit into Bass Mechanical's account occurred on February 18, 1987, twenty-three days prior to the bankruptcy filing. Therefore, under A.C.A. § 4–9–306(4)(d)(ii), First National would not have a perfected security interest in the proceeds which had been commingled with other deposits in the account under the specific provision as argued by Heckathorn.

However, the provisions of § 4–9–306(4)(d) are subject to the provisions of § 4–9–306(4)(d)(i) which provides that the perfected security interest in proceeds is subject to any right of set off. This Court is concluding, *infra*, that First National is entitled to a right of set off in

Bass Mechanical's general checking account. Therefore, the provisions of § 4–9–306(4)(d)(i) does not bar First National from receiving the proceeds.

(3) *Set–Off of Funds by First National.* First National has asserted that it is entitled to a right of set-off of the monies deposited in Bass Mechanical's checking account. Delbert and Mary Bass are also in favor of the set-off. Heckathorn has opposed any set-off by First National on the grounds that First National waived its right of set-off and now can not assert a right of set-off.

■ A bank generally has authority to set-off a depositor's account against a matured indebtedness. *Cherokee Carpet Mills v. Worthen Bank & Trust Co.,* 262 Ark. 776, 778, 561 S.W.2d 310, 312 (1978). A bankruptcy filing serves to accelerate the maturity of all debts so that a set-off right may be exercised post petition. *In re Hoffman,* 51 B.R. 42, 46 (Bankr.W.D.Ark. 1985). The Bankruptcy Code specifically preserves a creditor's right of set-off. *See* 11 U.S.C. § 553. Set-off, after a bankruptcy filing is limited, however, by the automatic stay provisions of 11 U.S.C. § 362(a)(7). If a creditor does not obtain relief from the automatic stay prior to exercising its right of set-off, a creditor violates the automatic stay provisions. *In re Hoffman,* 51 B.R. at 45; *In re Archer,* 34 B.R. 28, 30 (Bankr.N.D.Tex.1983). Therefore, when a bankruptcy is filed, a bank claiming a right of set-off in a debtor's account may be faced with a dilemma—whether it should turn over proceeds of debtor's account or whether it should exercise its set-off rights in violation of the automatic stay. To avoid this dilemma, many courts have allowed banks to place an "administrative freeze" on a debtor's account pending further disposition of the funds without violating the automatic stay. *In re Hoffman,* 51 B.R. at 46; *see also In re Edgins,* 36 B.R. 480 (Bankr.App. 9th Cir.1984); *Kenney's Franchise Corp. v. Central Fidelity Bank, N.A., Lynchburg,* 22 B.R. 747 (W.D.Va.1982); *In re Archer,* 34 B.R. at 30; *In re Gazelle, Inc.,* 17 B.R. 617 (Bankr.W.D.Wisc.1982). The placing

of an administrative freeze on a debtor's account operates to preserve the debtor's account and is not a direct or indirect attempt to improve the bank's right to a distribution of assets. *In re Hoffman*, 51 B.R. at 46.

■ The facts of the present situation reveal that First National did not waive its right of set-off, but in fact, acted to preserve its right of set-off. The note executed by Bass Mechanical in favor of First National provided First National with a right to set-off accounts from Bass Mechanical against its debt. Shortly after Bass Mechanical's bankruptcy filing, Delbert Bass, at Jacoway's request, attempted to withdraw funds from the Bass Mechanical account and turn over the funds to Jacoway. Vaughn Neil, the bank officer with whom Delbert Bass spoke, became concerned about turning over the monies and contacted Bill Clark, an attorney for First National, regarding the turn over and the bank's right of set-off. As a result of discussions between Clark and Jacoway, First National did not set-off the funds because of a possible violation of the automatic stay, but did allow the funds to be placed in a separate interest bearing account pending a determination of entitlement to a distribution of the funds. First National expressly reserved its rights of set-off and noted that it was not waiving its rights of set-off by placing the monies into a separate account and holding the monies pending Court order. By placing the funds in a separate account, First National essentially placed an administrative freeze on the funds. First National did not release or turn over the monies, but retained possession of the monies in the account pending a Court order for distribution. Therefore, First National continues to be entitled to exercise its right of set-off of the funds.[13]

■ Heckathorn has argued that First National's set-off rights are limited by 11 U.S.C. § 553(b) which provides that amounts set-off by a creditor within ninety days of the bankruptcy filing are limited by the extent to which a debtor's position was improved by the set-off. First National, however, did not exercise any set-off rights prior to Bass Mechanical's bankruptcy filing. In fact, First National has yet to exercise its right of set-off. If it were necessary, this Court would grant relief from the automatic stay to allow First National to exercise its right of set-off. However, Jacoway's proposed distribution to First National can be approved and accomplishing the same goal of distributing the funds to First National. The subject exchange of checks by and between the trustee and First National were specifically subject to this Court's determination of the right of set-off issue.

An Order will be entered consistent with this Memorandum Opinion approving the Trustee's Proposed Distribution of Funds to First National and overruling the objections thereto and denying the relief sought in the contested matters by Heckathorn, Haskell Johnson, Tyson and York–Shipley.

ORDER

Based on the Memorandum Opinion of even date, the Court makes the following ruling.

1. The evidence is insufficient to support the imposition of a constructive trust in favor of Heckathorn Construction Co., Inc. (Heckathorn), Haskell Johnson, Howard Baird & Courtney C. Crouch, Trustees for Tyson Food Employee Pension Trust, Tyson Foods, Inc. (Tyson) and York–Shipley, a Division of Donlee Technologies, Inc. (Donlee), and the allegations seeking a constructive trust are hereby dismissed.

2. First National Bank of Springdale (First National) has a perfected security interest in monies contained in a general checking account of the debtor, Bass Mechanical Contractors, Inc. (Bass Mechanical). The name change of Bass Plumbing, Heating and Cooling, Inc. to "Bass Mechanical Contractors, Inc." was not "seriously misleading" under A.C.A.

---

13. Further, because First National is entitled to right of set-off, regardless of whether First National's interest was perfected, First National would be entitled to assert a claim against Bass Mechanical's estate as a secured creditor. *See* 11 U.S.C. § 506(a).

§ 4–9–402(7) to prevent continued perfection of First National's security interest in assets of Bass Mechanical. Further, First National's entitlement to the proceeds of the account is not barred by A.C.A. § 4–9–306(4)(d)(ii) since First National remained entitled to set-off under § 4–9–306(4)(d)(ii).

3. First National did not waive and is entitled to exercise its right of set-off in the proceeds of the account.

4. Because First National is entitled to a distribution of the funds contained in Bass Mechanical's account, the Trustee's Motion for Proposed Distribution to First National is granted and approved. All objections to the motion are hereby overruled.

5. In view of this Court's ruling, the above contested matters are hereby dismissed.

IT IS SO ORDERED.